**In re Stephen C. PERRY, et al., Petitioners.**

**No. 88–1475.**

United States Court of Appeals, First Circuit.

Heard July 29, 1988.
Decided Oct. 19, 1988.

Amy R. Tabor, Cooperating Atty., Rhode Island Affiliate, American Civil Liberties Union, Pawtucket, R.I., and Edward J. Gorman, III, Asst. Gen. Counsel, United Broth. of Carpenters and Joiners of America, Washington, D.C., for petitioners.

Jeffrey A. Hennemuth with whom George R. Salem, Sol. of Labor, Allen H. Feldman, Associate Sol. for Sp. Appellate and Supreme Court Litigation, and Charles I. Hadden, Deputy Associate Sol., Washington, D.C., were on Response of the Secretary of Labor in Support of the Petition for a Writ of Mandamus and/or Prohibition for respondent Secretary of Labor.

Paul V. Lyons with whom John W. Teeter, Jr., and Foley, Hoag & Eliot, Boston, Mass., were on Response of General Dynamics Corp. in Opposition to Petition for Writ of Mandamus and/or Prohibition for respondent General Dynamics.

Scott R. McIntosh, Appellate Staff, Civil Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Earl R. Ohman, Jr., General Counsel, Bruce Justh, Deputy General Counsel, Eugene Patrick Moran, Thomas A. Loftus, and Anthony J. Steinmeyer, Appellate Staff, Civil Div., Washington, D.C., were on Response of the Occupational Safety and Health Review Com'n to Petition for Mandamus and/or Prohibition for respondent Occupational Safety and Health Review Com'n.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

We have before us a petition for Writs of Mandamus or Prohibition.[1] Petitioners wish to be free from a protective order limiting the matters on which they may speak. In addition, they would have us order the reinstatement of one of them as a representative in the underlying proceedings, since he was ejected from the proceedings for violating the order.

The controversy before us is an offshoot of certain proceedings currently being held before an administrative law judge (ALJ). The Occupational Safety and Health Administration (OSHA) cited General Dynamics for alleged violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–78 (the Act). Both General Dynamics and about 30 of its employees filed notices of contest, protesting different aspects of OSHA's enforcement actions relating to those claimed violations: the employees want quicker action, the employer none at all.

Whenever an employer or employees contest OSHA enforcement action, the proceedings are held before the Occupational Safety and Health Review Commission (the Commission). The Commission is an adjudicative body independent from OSHA.[2]

---

1. Pursuant to the authority of the All Writs Act, 28 U.S.C. § 1651, these writs are used respectively to compel a lower court to do or refrain from doing something. For ease of reference we will simply refer to the writs being sought as a writ of mandamus.

2. Although OSHA is an agency of the Department of Labor (DOL), the Commission also is independent of the DOL. The Secretary of Labor, a respondent in this matter, supports Perry's petition for a writ of mandamus.

Any case coming before the Commission is assigned to an ALJ, who conducts a hearing and issues a decision. Unless a Commission member directs, within 30 days, that the ALJ's decision be reviewed, the ALJ's decision becomes the Commission's final order. 29 U.S.C. § 661(j) (1982). Jurisdiction over appeals from final Commission orders lies in the court of appeals for the circuit in which the alleged violation is to have occurred. 29 U.S.C. § 660(a) (1982).

As the ALJ recognized, the employees obtained party status by virtue of 29 U.S.C. § 659(c) ("The rules of procedure prescribed by the Commission shall provide affected employees or representatives of affected employees an opportunity to participate as parties to hearings under this subsection."). He found, in his order of October 7, 1987, and it is not disputed for purposes of this appeal, that the employees were sufficiently affected by the claimed violations to have the right to intervene. Towards the end of the order granting them party status, however, the ALJ cautioned that "[o]nce it is shown ... that employees will use this proceeding for other exploitive purposes, they will have exceeded this matter's proper bounds and a motion to exclude them will be properly taken." The ALJ later relied in part on this language when declaring that his orders had been violated.

The Act and Commission rules also give employees the right to appear through an attorney or a "representative who is not an attorney." 29 C.F.R. § 2200.29(a). The petitioner employees designated Stephen Perry as their representative. Perry is not an attorney or an employee of General Dynamics. He works, rather, for the United Brotherhood of Carpenters and Joiners of America, one of the three constituent unions of the United Shipbuilding Crafts (USC) which has been trying for three years to organize General Dynamics' work force at the Quonset Point Electric Boat facility (Electric Boat). The petitioner employees' choice was apparently influenced by the fact that they also have a strong interest in seeing USC organize General Dynamics' employees at the Electric Boat facility.

USC itself is not a party to the proceedings, because it has not been certified as the employees' collective bargaining representative.

General Dynamics from the start challenged the employees' right to be present at the hearings, as well as the selection of Perry as their representative. Its main objection to Perry's involvement appears to stem from his position as a leader of the USC's organization campaign at the shipyard. In its view, Perry's USC affiliation renders him incapable of being primarily concerned about addressing health and safety issues through the administrative proceedings. Instead, it argues, Perry has been using, and will continue to use, the hearings to "spearhead" USC's organizational campaign. The problem, of course, is that Perry's two areas of interest are not necessarily mutually exclusive. As long as his demeanor and behavior in the proceedings are satisfactory, any outside union activity is absolutely irrelevant to his ability to represent the employees. And neither the statute nor the regulations preclude a representative from being affiliated with a union. In fact, the employees' choice of representative is not restricted in any way at all.

What immediately concerns us is the protective order issued by the ALJ on January 12, 1988 (and, to the extent he relied on it, the order of October 7, 1987). In anticipation of some scheduled depositions, and foreseeing the uses the USC might wish to make of the information elicited thereby, General Dynamics requested that the ALJ "issue a protective order to preserve the confidentiality of information disclosed during the depositions." In response, on January 12, the ALJ issued the following order:

> All information developed through this proceeding shall be used only to resolve the issues herein. Any abuse of this may terminate a party's right to participate.

The depositions, however, did not take place as scheduled. The purported deponents interposed a Fifth Amendment claim

of privilege because they were advised that the case might be referred to the U.S. Attorney for a possible criminal prosecution. This possibility inflamed USC campaign rhetoric. Leaflets appeared suggesting that some of the Electric Boat managers might spend time in jail, in addition to others emphasizing and even exaggerating USC's role [3] on behalf of the employees in the proceedings. The implication, of course, was that General Dynamics could not be trusted to safeguard the employees, and that the employees should therefore turn to USC for protection.

General Dynamics responded by filing a motion to exclude the employees and Stephen Perry from the proceeding. It alleged that Perry, in his capacity as USC representative, had violated the ALJ's protective order and was exploiting the proceedings for organizational purposes. The ALJ agreed, and excluded Perry from the hearings. He permitted the employees to select another representative, as long as this new representative, if he was not an employee of General Dynamics himself, was not a member of USC. Perry petitioned the Commission for discretionary interlocutory review of the ALJ's order. *See* 29 C.F.R. § 2200.73 (1987). However, at the time of Perry's petition, there were two vacancies on the Commission, so that it had only one member, instead of three. The Commission therefore could not rule on Perry's petition, because a quorum of two is necessary for the Commission to take official action. 29 U.S.C. § 661(f) (1982). Instead, Perry's petition automatically was denied when the Commission took no action within 30 days. *See* 29 C.F.R. § 2200.73(b) (1987).

■ We have no appellate jurisdiction over the Commission's denial of Perry's petition for interlocutory review. *See* 29 U.S.C. §§ 659(c), 660(a) (1982) (court of appeals has jurisdiction only over appeals from *final* Commission orders). However, the All Writs Act authorizes courts to issue "all writs necessary or appropriate in aid of

their respective jurisdictions...." 28 U.S.C. § 1651 (1982). This power to issue mandamus includes "not only cases on appeal, but matters which could eventually lead to appeals." *United States v. Kane*, 646 F.2d 4, 9 (1st Cir.1981) (citing *inter alia, LaBuy v. Howes Leather Co.*, 352 U.S. 249, 255, 77 S.Ct. 309, 313, 1 L.Ed.2d 290 (1957)). In this case, an appeal could lie later from a final order of the Commission in the matter presently before the ALJ. 29 U.S.C. § 660(a) (1982). Accordingly, in spite of the unusual circumstance that we are entertaining a petition for a writ directly against the ALJ, rather than the Commission, it is clear that we have jurisdiction to entertain the mandamus petition and to grant relief if appropriate.

Whether we choose to exercise jurisdiction and grant relief is, of course, a different matter. *See* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3932 n. 6 (1977) (distinguishing between having power to issue writs and exercising that power).

■ The first hurdle the petitioners must clear is a formidable one: a writ of mandamus is not to be used to resolve matters suitable to an ordinary appeal. *Will v. United States*, 389 U.S. 90, 97, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967). Mandamus may, however, be appropriate when the lower court is acting beyond its authority to such an extent that its action constitutes a usurpation of power, *id.* at 95, 88 S.Ct. at 273, as long as the petitioners demonstrate that they are clearly and indisputably entitled to the writ. *Id.*

The writ is uniquely appropriate when "interlocutory relief is necessary to prevent irreparable harm." *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17, 20 (1st Cir.1982). *Cf. Director, Office of Workers' Compensation Programs v. Bath Iron Works Corp.*, 853 F.2d 11, 14 (1st Cir.1988) (interlocutory appeal warranted where, *inter alia*, "cognizable harm of an unusual sort would result from the delay"). Irreparable harm can occur when

---

**3.** USC has, in fact, been lending some assistance to the party employees. While the ALJ might dislike this fact, it is completely irrelevant to his function, and to the development of the proceedings, except insofar as it permits the employees to participate more effectively.

the petitioners have no other adequate means of obtaining relief, *see Towns of Wellesley, Concord and Norwood, Mass. v. F.E.R.C.,* 829 F.2d 275, 277 (1st Cir.1987), such as when the opportunity to challenge the order on appeal may never arise.

This is clearly such a case. The harm here goes far beyond the mere burden and expense of protracted litigation. *Cf. In re Justices,* 695 F.2d at 20. It is caused, rather, by the passage of time during which the petitioners are impaired in the exercise of their freedom of speech in pursuit of a union organizational campaign. The Ninth Circuit recognized this sort of harm in a situation almost identical to the one here. *See In re Halkin,* 598 F.2d 176 (D.C.Cir.1979).[4] That case involved some very sensitive political issues, and required the CIA to turn over a large amount of information in the course of discovery. The district court judge issued an order preventing the parties and their counsel from disclosing any information obtained through discovery. His rationale was strikingly similar to the ALJ's in this case: he found that disclosure would be "contrary to rules applicable to the conduct of litigation before this Court and inconsistent with the obligations of parties and their counsel to further the determination of matters within its jurisdiction." *Id.* at 182 (quoting the district court's order). After finding that the petitioners' First Amendment claim was a meritorious one, the circuit court determined that mandamus was appropriate.[5]

One of the main considerations in *Halkin* was that, while First Amendment protected speech was being restrained, every additional day on which the petitioners could not speak was additional irreparable harm.

*Id.* at 199. *See also Nebraska Press Ass'n v. Stuart,* 423 U.S. 1327, 1329, 96 S.Ct. 251, 253, 46 L.Ed.2d 237 (1975) (Blackmun, J., in-chambers opinion) ("Where, however, a direct prior restraint is imposed upon the reporting of news by the media, each passing day may constitute a separate and cognizable infringement of the First Amendment").[6] Without question, the right to free speech includes the right to timely speech on matters of current importance. While the ALJ's orders continue in place, the employee representatives are prevented from vigorously pursuing their organizational campaign, during which also, timeliness is essential. And Perry, on the other hand, has already been punished and continues to be punished—by being denied the opportunity to do something which he has a statutory right to do—simply because he chose forcefully to advocate a certain viewpoint.

In addition, there is a distinct likelihood that the petitioners will never have the opportunity to have this question heard on appeal. Perry, for example, asserts that he has been penalized for the exercise of his constitutional rights. Were he to wait, and seek administrative and judicial review of the ALJ's final order, his constitutional claim would be largely lost: unless his dismissal as representative somehow affected the fairness of the proceedings, any error in dismissing Perry would be harmless. In addition, should the employees prevail, albeit with a different representative, no appeal on their behalf could follow. A settlement agreement between the Secretary of Labor, who prosecutes the complaints before the Commission, and General Dynamics would have the same result.

---

4. While *Halkin's* constitutional analysis was disapproved in *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), its observations regarding the availability of mandamus are unaffected by that decision.

5. The *Halkin* court also noted favorably that the trial was not delayed for resolution of the petition for mandamus. Here too we are advised that the hearings continue apace, while the parties await our decision on mandamus.

6. Indeed, we ourselves suggested in *Matter of Providence Journal Co.,* 820 F.2d 1342 (1st Cir. 1986), that a member of the press (also a party to the proceedings) might seek a writ of mandamus where it had been prevented from disseminating information acquired in the course of litigation. After en banc consideration, we went even further, and strongly encouraged parties to seek "emergency relief" from an appellate court in these situations. *Matter of Providence Journal Co.,* 820 F.2d 1354, 1355 (1st Cir.1987) (*en banc*) (per curiam).

In fact, the claim before us today alleges a violation of Perry's and the employees' constitutional rights that is completely divorced from the merits and eventual resolution of the hearings before the commission. An appeal from the final resolution of those hearings, therefore, would be addressed to the merits of that case, and not to the constitutional harm suffered by the petitioners. The petitioners therefore have clearly "demonstrate[d] that something about the circumstances here would make an ordinary appeal inadequate to protect their interests." *In re Justices*, 695 F.2d at 20 (citations omitted). Although we continue to adhere to the view that extraordinary writs should be reserved for truly extraordinary circumstances, we conclude that the substantial weight of authority indicates that we should issue the writ in this case if we determine that the ALJ so far exceeded his authority in preventing petitioners' exercise of their fundamental First Amendment rights, that his action clearly constituted a usurpation of power. We turn, accordingly, to the merits of petitioners' claim.

█ Unquestionably, not all orders restraining the parties to a case from commenting on information gathered during discovery violate the First Amendment. The Supreme Court has set forth a pattern, however, to which all such orders must conform. We will first describe that pattern, then hold up to it the ALJ's order below, as interpreted and applied by the ALJ himself, to decide if the order was constitutionally styled.

The Supreme Court has upheld the constitutionality of a protective order that was, on its face, of the same nature as the ALJ's order of January 12. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). As we have recently described it, the Supreme Court there concluded "that if the good cause standard is met, and the order is restricted to the discovery context and does not prohibit dissemination of information gained from other sources, then it does not

offend the First Amendment." *Anderson v. Cryovac*, 805 F.2d 1, 7 (1st Cir.1986). In that case, the Court held that "[t]he prevention of the abuse that can attend the coerced production of information under a State's discovery rule is sufficient justification for the authorization of protective orders." *Id.* 467 U.S. at 35–36, 104 S.Ct. at 2208–09. If the ALJ had merely restricted the dissemination of any information produced by General Dynamics under the compulsion of the court's power to force discovery, we would probably not interfere at this stage.[7] It is obvious, however, that the ALJ put the parties under a significantly different restriction.

The ALJ excluded Perry because of certain leaflets published by the USC. The first handbill to which the ALJ objected was titled "Here Comes the Judge!" (*See* Appendix A). It stated, in essence, that it was only the USC, and not OSHA or General Dynamics, who could be trusted to protect the workers from industrial hazards. As evidence of USC's concern, the flyer pointed to, among other things, USC's supposed participation in the proceedings before the Commission. To this the ALJ said: "This is a blatant violation of the orders against exploitation and abuse. The United Shipbuilding Crafts (USC) is not a party hereto; and the orders of October 7, 1987, and January 12, 1988, were specifically aimed at preventing the suggestion of that condition because the Commission does not allow any union participation unless the union has collective bargaining rights, 29 C.F.R. § 2200.1(g)." The flyer violated his orders simply because therein "the USC has held itself out to be involved in this proceeding far beyond" the actual scope of its involvement, and not because it disclosed any discovery information.

It appears, therefore, that the orders were simply intended to keep the union from using General Dynamics' status as a defendant in the proceedings, and its own assistance to the employees in prosecuting the complaints, as propaganda in its organizational campaign. As the ALJ himself

---

**7.** We do not, in any event, examine whether "good cause" existed for such an order, since, as we explain below, this appeal raises a different issue.

put it, "[t]he employee representative could disclose whatever he wished to but he was forbidden to exploit and abuse."

The true nature of the orders, therefore, as revealed by their application, bears no resemblance whatsoever to the orders in *Seattle Times Co. v. Rhinehart*, discussed above. They act, rather, in the same fashion as those orders discussed, and struck down, in *Bridges v. California*, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). The cases discussed in that opinion involved contempt convictions for public comments pertaining to pending litigation. The commentary forbidden by the lower courts therein was the same kind of propagandistic hyperbole to which the ALJ objected in the instant case. There, as here, the trial judges were concerned about the effect these public statements would have on the proceedings; there, as here, the trial judges' fears failed to provide adequate justification for restricting the parties' freedom of speech.

The ALJ here believed that the USC's public statements about its role in the proceedings would somehow expand the scope of the hearings, or make the Union a party even though the regulations prohibit non-certified unions from participating. He makes no mention whatever of any actual effect these statements might have had on the conduct of the proceedings. There is no intimation, for example, that Perry or the party-employees have done or failed to do anything in the proceedings which might be detrimental to the hearings, but might provide good grist for the organizational mill. On the contrary, the ALJ relies exclusively on out-of-court statements made in the course of the union campaign as the factual predicate for the sanction. In *Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946), the Supreme Court responded to similar concerns in this way:

> Certainly this criticism of the judges' inclinations or actions in these pending non-jury proceedings could not directly affect [the administration of justice]. This criticism of their actions could not affect their ability to decide the issues. Here there is only criticism of judicial

action already taken, although the cases were still pending on other points or might be revived by rehearings. For such injuries, when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants.

*Id.* at 348–49, 66 S.Ct. at 1038. Here too, to the extent the leaflets criticized or misrepresented what was taking place in the hearings, they could not affect the ALJ's resolution of the issues. The ALJ was not likely suddenly to believe the union was a party to the proceedings, nor was he likely to bow to public criticism of his actions.

In the final analysis, the ALJ is simply trying to regulate the contents of USC campaign literature—his main objection being that some of it is untrue. This he cannot do. The USC's efforts to organize, and the propriety of its conduct during that effort, is the province of the National Labor Relations Board, not the Occupational Safety and Health Review Commission.

Only one of the rationales put forth by the ALJ for his action falls within his cognizance. That is when he refers to rule 104(b), 29 C.F.R. § 2200.104, which gives the ALJ the power to exclude from the proceedings any person who fails to act in good faith. The flyers, the ALJ said, "clearly indicate that the underlying purpose of the party status by employees is to enhance union organizing activity under the guise of employee safety." But again, the only activity of which the ALJ expressly disapproved was union organizing activity. Neither the employees—by losing their representative of choice—nor Perry, by being excluded from the proceedings, can constitutionally be sanctioned for exercising their constitutional rights, without at the very least a showing of some serious detrimental effect on the hearings. *Bridges v. California*, 314 U.S. at 270, 62 S.Ct. at 197. There are no findings in the record of any such deleterious effect resulting from the leaflets.

As another interest furthered by the ALJ's orders, General Dynamics argues that the union's commentary could inhibit it

from presenting a vigorous defense, or even impair its right to a fair trial in a later criminal proceeding. The Supreme Court, however, has held that a general restriction on publication could not be justified by the danger that it might impair a defendant's right to a fair trial. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). If prejudice of the magnitude described in *Nebraska Press Ass'n* to an interest as paramount as the Sixth Amendment right to a fair trial cannot justify a protective order, then much less will mere embarrassment to a defendant stemming from disclosure of the vigorous defense of an unpopular cause, or even the possible effect on a still hypothetical criminal prosecution, justify this order.

 There is one other characteristic of the October 7 and January 12 orders which renders them constitutionally infirm. In describing his orders, the ALJ made the following comment: "There is no manner by which these orders could be interpreted as impinging on the employees' constitutional rights. They are too broad, to [sic] imprecise and belie any intention of restricting any party in any way except in the exploitation and the abuse of this proceeding . . . ." (footnotes omitted). We agree that the orders are broad and imprecise, as evidenced especially by the disparity between the language of the January 12 or-

der and its actual operation. We do not agree, however, that this vagueness is a constitutional virtue. The Supreme Court recently said that "[a] prohibition regarding 'implicative' information is too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. at 568, 96 S.Ct. at 2807 (citations omitted). As interpreted and applied, the orders here in question are too vague and too broad to survive First Amendment scrutiny.

We conclude that the naked attempt to control the course of the union's campaign, without advancing any cognizable compelling interest which could be furthered thereby, so far exceeds the proper scope of the Commission's authority as to constitute a usurpation of power. Nevertheless, we refrain from the actual issuance of the writ of mandamus, confident that the Commission and the ALJ will fully comply with our holdings, allow Perry's reinstatement as the employees' representative, and refrain from the taking of any retaliatory action. In the unlikely event that compliance is not forthcoming, petitioners may reapply to the panel, by motion, for issuance of the writ. Petitioners' prayer for attorneys' fees is denied, as they have cited no authority which would permit such redress. We do, however, award them ordinary costs.

APPENDIX A

# HERE COMES THE JUDGE !

Who will insure that we are protected from the ...azards inherent in the shipbuilding industry?

Who will monitor EB's compliance with safety and health laws?

What will happen if EB management continues to thumb its nose at the law?

Who will make sure that OSHA does their job to guarantee our protection from workplace hazards?

Who will pay the legal fees and provide the expertise necessary to fight for our right to a safe and healthful workplace?

The answers to all of the above questions is the USC Union.

It was the USC Union who was interested enough in our safety and health to help us file complaints over safety issues which management refused to correct.

It was the USC Union who pushed OSHA and monitored their performance during five inspections in the last year

It was the USC Union who assisted us in getting party status in the legal cases which followed.

It was the USC Union who did the work, provided the legal assistance and the expertise.

It is the USC Union who is working on our behalf, in the Occupational Safety and Health Review Commission hearings

It is the USC Union, staff and the workers who have the guts to do what is right by giving testimony in support of a safe and healthful workplace.

EB management has done nothing but lie and attempt to deny that hazards exist at Quonset. Now they stand before Judge Knight in Boston. They have already admitted that they were in violation in many areas of the facility during the trial. The USC has brought witnesses to uncover more of their lies.

## REMEMBER

Workers care about workers and the USC is workers. EB doesn't give a damn about us! We are just a number! Wake up and help yourself before it is too late

Think about yourself and your family. Our families depend on us to come home safe every day. **SIGN NOW TO INSURE YOUR SAFETY AND HEALTH.**

### AUTHORIZATION FOR REPRESENTATION

I, the undersigned, hereby authorize the UNITED SHIPBUILDING CRAFTS to represent me in collective bargaining with the General Dynamics, Electric Boat Division, Quonset Point, R.I.

Name ..................................................
(PLEASE PRINT)

Address .............................................. Phone ........

City ........................... State .............. Zip .......

Badge No. ............ Foremans Name .....................

Department ..........Building........... Work Center ..........

Classification...................... Shift: 1st 2nd 3rd (Circle One)

Date of Hire ...........................................

Date ............ Signature ...............................

02. 13 88 08.30 AM P03