

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-1994

# IN RE: Asbestos School Litigation

Precedential or Non-Precedential:

Docket 94-1494

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"IN RE: Asbestos School Litigation" (1994). *1994 Decisions.* Paper 227.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/227

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 94-1494

————————

IN RE:  ASBESTOS SCHOOL LITIGATION

PFIZER INC.,
Petitioner

v.

THE HONORABLE JAMES T. GILES,
Nominal Respondent

and

BARNWELL SCHOOL DISTRICT NO. 45; SCHOOL DISTRICT
OF LANCASTER; MANHEIM TOWNSHIP SCHOOL DISTRICT;
LAMPETER-STRASBURG SCHOOL DISTRICT; BOARD OF
EDUCATION OF THE MEMPHIS CITY SCHOOLS And A
Conditionally Certified Class

————————

PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Related to D. C. Civil No. 83-00268)

————————

Argued:  September 16, 1994
Before:  STAPLETON, ALITO, and LEWIS, <u>Circuit Judges</u>

(Opinion Filed: December 28, 1994  )

————————

CHARLES R. BRUTON (Argued)
RICHARD W. FOLTZ, JR.
MAUREEN E. LOWRY
PEPPER, HAMILTON & SCHEETZ
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799

<u>Attorneys for Petitioner, Pfizer Inc.</u>

HARVEY S. KRONFELD
HARVEY S. KRONFELD, P.C.
21 Bala Avenue
Bala-Cynwyd, PA  19004

DAVID BERGER
HAROLD BERGER
THOMAS F. HUGHES
GERALD E. WALLERSTEIN
DAVID BERGER ATTORNEYS AT LAW
1622 Locust Street
Philadelphia, PA  19103

Co-Lead Counsel for Class-Plaintiff

ARNOLD LEVIN
LAURENCE S. BERMAN
LEVIN, FISHBEIN, SEDRAN & BERMAN
320 Walnut Street, 6th Floor
Philadelphia, PA  19106

Chair, Plaintiffs' Trial and Liability Committee

ARTHUR R. MILLER (Argued)
1545 Massachusetts Avenue
Cambridge, MA 02138

Of Counsel for Class-Plaintiff

FLOYD ABRAMS (Argued)
ALLEN S. JOSLYN
CAHILL GORDON & REINDEL
80 Pine Street
New York, New York  10005

Attorneys for Respondent, W.R. Grace & Co. - Conn.

JOHN H. LEWIS, JR.
JOSEPH B. G. FAY
J. GORDON COONEY, JR.
MORGAN, LEWIS & BOCKIUS
2000 One Logan Square
Philadelphia, PA  19103-6993

Attorneys for Respondent, United States Gypsum Company

GEORGE D. WEBSTER
WEBSTER, CHAMBERLAIN & BEAN

1747 Pennsylvania Avenue N.W.
Washington, D.C. 20006

<u>Attorneys for the American Society of Association Executives</u>

                         STEPHEN J. IMBRIGLIA
                         HECKER, BROWN, SHERRY & JOHNSON
                         18TH AND Arch Streets
                         1700 Two Logan Square
                         Philadelphia, PA  19103

        Attorneys for Respondent, U.S. Mineral Products Company

                         DENNIS B. STEPEHENS
                         SCHWABLAND AND RYAN, P.C.
                         1260 One Penn Center
                         1617 John F. Kennedy Blvd.
                         Philadelphia, PA  19103

          Attorneys for Respondent, Asbestospray, Inc.
                   _____

                        OPINION OF THE COURT
                  _____


ALITO, Circuit Judge:


        This is the latest appellate chapter in a lengthy
nationwide class action in which more than 30,000 school
districts have sought relief from former manufacturers of
asbestos-containing building products ("ACBPs") for harm stemming
from the installation of ACBPs in their school buildings.[1]  The

---

[1].  Different aspects of this case have been before our court on prior occasions.  See In re School Asbestos Litig., 977 F.2d 764 (3d Cir. 1992); In re School Asbestos Litig., 921 F.2d 1338 (3d Cir. 1990), cert. denied sub nom., W.R. Grace & Co. v. Barnwell School Dist. No. 45, 499 U.S. 976 (1991); In re School Asbestos Litig., 921 F.2d 1330 (3d Cir. 1990), cert. denied sub nom., Kaiser Cement Corp. v. Lake Asbestos of Quebec, Ltd., 499 U.S. 976 (1991); In re School Asbestos Litig., 921 F.2d 1310 (3d Cir. 1990), cert. denied sub nom., United States Gypsum Co. v Barnwell School Dist. No. 45, 499 U.S. 976 (1991); In re School Asbestos Litig., 920 F.2d 219 (3d Cir. 1990); In re School Asbestos Litig., 842 F.2d 671 (3d Cir. 1988); In re School Asbestos Litig., 789 F.2d 996 (3d Cir. 1986), cert. denied sub nom., Celotex Corp. v. School Dist. of Lancaster, 479 U.S. 852 (1986), and cert. denied sub nom., Nat'l Gypsum Co. v. School Dist. of Lancaster, 479 U.S. 915 (1986).

current proceeding concerns a petition for a writ of mandamus filed by one of the defendants, Pfizer Inc. In that petition, Pfizer seeks review of the district court's denial of its motion for partial summary judgment on the plaintiffs' conspiracy and concert of action claims. Pfizer argues that the denial of that motion has caused and is continuing to cause irreparable harm to its First Amendment rights. Applying the Supreme Court's decision in N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 (1982), we hold that Pfizer cannot, consistent with the First Amendment, be held liable on the plaintiffs' conspiracy and concert of action claims and that the denial of Pfizer's partial summary judgment motion was clearly in error. We further hold that the issuance of a writ of mandamus is appropriate to prevent the harm to First Amendment rights that would occur if review of the district court's decision had to wait until a final judgment is entered in this protracted litigation.

I.

The initial complaints in this case were filed in early 1983, and Pfizer was added as a defendant in January 1984. The plaintiff school districts alleged that until the 1970s[2] Pfizer and the other defendants had produced and sold ACBPs without

_____

[2]. The plaintiffs asserted that "[s]ubstantial amounts of asbestos ha[d] been used in school buildings, beginning as early as 1900 and particularly during the period 1946 through 1972." App. 28a. "The application of friable asbestos-containing material," the plaintiffs' complaint noted, "was banned by the United States Environmental Protection Agency by December 31, 1978." Id.

warnings even though they knew that the ACBPs would be used in school buildings and that their presence there would be dangerous.  Seeking compensatory and punitive damages and injunctive relief, the plaintiffs asserted claims based on negligence, strict liability, breach of implied warranties, and intentional tort.  Additionally, the plaintiffs alleged that the defendants had acted pursuant to a "concert of action" and "civil conspiracy," and as a result, the plaintiffs argued, each defendant was legally responsible for every other defendant's conduct.  See App. 264a-65a.

In January 1993, after extensive discovery, Pfizer moved for summary judgment on the plaintiffs' civil conspiracy and concert of action claims.  Pfizer contended that the plaintiffs "ha[d] been unable to proffer any competent evidence to support either a claim of conspiracy or concert of action against Pfizer." App. 51a.  Pfizer stated that the plaintiffs' proof against it consisted entirely of the following: (1) that Pfizer had marketed an asbestos-containing construction product, Kilnoise, from 1964 until 1972 and (2) that in 1984 Pfizer had become associated with a trade organization called the Safe Buildings Alliance ("SBA"). See id. at 53a-54a, 57a-58a.  As we noted in In re School Asbestos Litigation, 842 F. 2d 671, 674-75 (3d. Cir. 1988), the SBA has been described by the defendants as "a lobbying and public education organization" that has "represented its members' views before Congress, the EPA, state legislatures and regulatory agencies" and "has also presented its views to the general public through a self-initiated `public

education campaign.'"  In support of its summary judgment motion,

Pfizer maintained:

> The fact that Pfizer began producing one
> asbestos-containing construction product in
> 1964 is not evidence of the existence of or
> any participation in a conspiracy or concert
> of action.  Moreover, Pfizer's joining the
> SBA twelve years after it ceased production
> of Kilnoise . . . and one year after this
>     lawsuit was filed does not constitute
> "evidence" of conspiratorial or concerted
> activity.  Sharing and discussing information
> which is a matter of public record and debate
> in a voluntary association such as the SBA is
> neither a conspiracy nor a concert of action
> that was in any way illegal.

App. 58a (emphasis in original).

In opposition to Pfizer's motion, the plaintiffs first
intimated that their conspiracy and concert of actions claims
could survive summary judgment because Pfizer, in marketing
Kilnoise, had consciously chosen to follow the same course of
deceptive conduct as the other defendants.  The plaintiffs wrote:

> [P]fizer marketed an asbestos-containing
> product for an eight-year period without
> warnings though it had specific knowledge of
> its product's hazard.  This conduct was in
> keeping with the method of marketing asbestos
> products by its co-conspirators, as Pfizer
> well knew, without any or adequate warnings.

App. 262a.

The plaintiffs then argued that their conspiracy and
concert of action claims could also survive summary judgment
based on Pfizer's association with the SBA.  The plaintiffs
maintained that Pfizer had been an "associate member of the SBA."
They stated that the SBA had been formed to coordinate the

defendants' "legal and communications positions," that the SBA "had disseminated misleading information about the danger of asbestos in schools directly to class members in this litigation," and that the SBA's activities had been intended to limit its members' "liability for their prior sales . . . by discouraging school district class members from incurring more expensive asbestos removal costs as opposed to possibly cheaper encapsulation methods, and were also intended to cover up or continue the effects of their earlier suppression of the hazards of their products."  Id. at 262a-64a (emphasis in original deleted).  The plaintiffs argued that Pfizer, by associating with the SBA, had joined an ongoing civil conspiracy or concert of action and had thus become liable for all of the other defendants' prior tortious conduct.  Id. at 264a-65a.

The district court denied Pfizer's motion.  The court did not adopt the argument that Pfizer could be held to have entered into a conspiracy or concert of action due to its conscious choice of a course of conduct that parallelled those of its co-defendants.  Rather, the court concluded that "there [was] evidence by which a jury could reasonably find that Pfizer later joined an ongoing conspiracy/concert of action by its involvement with, and financial support for . . . [ the SBA]."  Dist. Ct. Op. at 1-2.  The court noted (Dist. Ct. Op. at 2 & n.1) that, in an earlier ruling concerning the plaintiffs' request for an injunction, the court had found that "Pfizer, Inc. . . . ., although it is not a member of the SBA, ha[d] contributed insignificantly to the financing of the SBA."  See In re Asbestos

School Litigation, 115 F.R.D. 22, 24 (E.D. Pa. 1987), vacated on other grounds, 842 F.2d 671 (3d Cir. 1988).  However, the court concluded that these findings were not binding at the summary judgment stage and that it should be left for the jury to decide whether Pfizer had become a member of the SBA and whether its contributions (which the plaintiffs allege amounted to at least $50,000) were significant.  The court also noted that "Pfizer's counsel [had] admitted at oral argument that three or four of Pfizer's in-house attorneys [had] attended SBA meetings when topics of interest to Pfizer were discussed."  Dist. Ct. Op. at 2. (footnote omitted).

Observing that Pfizer had maintained that the SBA's sole purpose was "to disseminate to the public, government, and regulatory agencies its members' views about the proper means for dealing with asbestos that was already in place in buildings," the court stated that if this was indeed the SBA's sole purpose, the "plaintiffs' conspiracy and concert of action claims against Pfizer would fail for lack of causation" because the complaint did not allege that the defendants had caused the plaintiffs damage "by misleading them about proper techniques of asbestos removal or abatement."  Id. at 3.  The court continued:

> However, Plaintiffs have submitted evidence that the actions of SBA . . . were also aimed in part at convincing the public that SBA members had no prior knowledge of the dangers of asbestos.  Thus, SBA's actions could reasonably be interpreted by a jury as contributing to an ongoing conspiracy to conceal the asbestos industry's alleged knowledge of the dangers of asbestos.

Id. at 4.

Pfizer moved for reconsideration, arguing that the district court's decision "penalize[d] Pfizer's exercise of its First Amendment rights to engage in free speech and to associate with [the SBA]." App. 325a-26a. Citing <u>N.A.A.C.P. v. Claiborne Hardware Co.</u>, 458 U.S. at 918-20, Pfizer added: "The United States Supreme Court has often cautioned that conspiracy liability cannot be constitutionally imposed based upon mere association." <u>Id.</u> at 326a. The district court denied reconsideration, as well as Pfizer's request for certification of an interlocutory appeal. Pfizer then filed the mandamus petition that is now before us.

## II.

The general standards for issuing a writ of mandamus have been restated many times. As we wrote in a prior mandamus proceeding in this case:

> The traditional use of mandamus has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it has a duty to do so." <u>Roche v. Evaporated Milk Association</u>, 319 U.S. 21, 26, 63 S. Ct. 938, 941, 87 L.Ed. 1185 (1943). Even under that formulation, however, "courts have not confined themselves to any narrow or technical definition of the term `jurisdiction.'" <u>United States v. Santtini</u>, 963 F.2d 585, 594 (3d Cir. 1992). <u>See</u> <u>Mallard v. United States District Court</u>, 490 U.S. 296, 309, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989). . . . Mandamus may be especially appropriate to further supervisory and instructional goals, and where issues are unsettled and important. <u>See</u> <u>Sporck v. Peil</u>, 759 F.2d 312, 315 (3d Cir. 1985); <u>United</u>

> States v. Christian, 660 F.2d 892, 895-97 (3d
> Cir. 1981); Rapp v. Van Dusen, 350 F.2d 806,
> 810 (3d Cir. 1965) (in banc).

In re School Asbestos Litigation, 977 F.2d 764, 773 (3d Cir. 1992). See also, e.g., Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 163 (3d Cir. 1993); United States v Bertoli, 994 F.2d 1002, 1014-15 (3d Cir. 1993); Haines v. Liggett Group, Inc., 975 F.2d 81, 88-89 (3d Cir. 1992); In re Pruitt, 910 F.2d 1160, 1167 (3d Cir. 1990); United States v. Martinez-Zayas, 857 F.2d 122, 127 (3d Cir. 1988).

Since mandamus is an "extraordinary" remedy, it must be invoked sparingly. See In re School Asbestos Litig., 977 F.2d at 774. Excessive use would undermine the important goal of avoiding piecemeal appellate review. Kerr v. United States District Court, 426 U.S. 394, 403 (1976).[3] In order to ensure that writs of mandamus are restricted to extraordinary situations, the Supreme Court has set forth two conditions that must be satisfied: first, the petitioner must show a "clear and indisputable" right to the writ and, second, the petitioner must have "no other adequate means to attain the relief . . . desire[d]." Kerr, 426 U.S. at 403. "Once these two prerequisites are met, the court's decision whether to issue the

_____

[3]. It has also been noted that mandamus now has the unfortunate consequence of making the district court judge a litigant. Kerr, 426 U.S. at 402; Fed. R. App. P. 21. Under a preliminary draft of a proposed amendment to Fed. R. App. P. 21, however, the trial judge would no longer be treated as a respondent. See Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Request for Comment on Preliminary Draft of Proposed Amendments to the Federal Rules of Appellate Procedure, etc., 156 F.R.D. 340, 350 (Sept. 1, 1994).

writ is largely one of discretion." Haines, 975 F.2d at 89. See also Kerr, 426 U.S. at 403; Alexander, 10 F.3d at 163; In re School Asbestos Litigation, 977 F.2d at 772.

III.

A. In considering Pfizer's petition, we turn first to the question whether Pfizer has shown that it has a "clear and indisputable right" to the issuance of a writ. Kerr, 426 U.S. at 403. We hold that Pfizer has made this showing because the district court's decision lies far outside the bounds of established First Amendment law.

As Pfizer contends, the district court's decision is squarely inconsistent with the Supreme Court's decision in N.A.A.C.P. v. Claiborne Hardware Co., supra. Claiborne Hardware resulted from events in Claiborne County, Mississippi, from 1966 to 1972. African-American citizens of the county presented white elected officials with a list of demands regarding racial equality and integration, and when a satisfactory response was not received, several hundred persons attending a meeting of the local branch of the N.A.A.C.P. voted to place a boycott on white merchants in the area. The boycott was generally supported by speeches and nonviolent picketing, but some threats and acts of violence did occur. After several years, a group of white merchants brought suit in state court and named as defendants the N.A.A.C.P., a local organization, and numerous individuals. After a bench trial, most of the defendants were found to be jointly and severally liable, based on three separate legal

theories, for all of the merchants' losses since the inception of the boycott.  The Mississippi Supreme Court reversed the lower court's holding of liability under two of the three legal theories but sustained its holding with respect to most of the remaining defendants under the third theory, which was based on civil conspiracy and the common law tort of malicious interference with the plaintiffs' businesses.  458 U.S. at 891 & n.7, 894-95.

The United States Supreme Court unanimously reversed. The Court concluded that the nonviolent elements of the boycott -- giving speeches, banding together for collective advocacy, nonviolent picketing, personal solicitation of nonparticipants, and the use of a local black newspaper -- were protected by the First Amendment.  458 U.S at 907-15.  While noting that the First Amendment did not shield the acts of violence that had been committed in connection with the boycott, the Court explained:

> Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence.  For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.  "In this sensitive field, the State may not employ `means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'"

Id. at 920 (citations omitted) (emphasis added).  Moreover, the Court "emphasized that this intent must be judged `according to the strictest law.'"  Id. at 919, (quoting Noto v. United States, 367 U.S. 290, 299-300 (1961)). Applying this standard, the court

held that on the record before it "no judgment [could] be sustained against most of the petitioners." Id. at 924.

In the present case, it is abundantly clear that the strict standard set out in Claiborne Hardware cannot be met. For one thing, Pfizer's association with the SBA, which was formed in 1984, cannot possibly show that Pfizer specifically intended to further the other defendants' manufacture and distribution of ACBPs, which ceased in the 1970s. Yet as the district court observed, all of the harm for which the plaintiffs sought relief was caused by the manufacture and distribution of ACBPs and not by any allegedly misleading statements that the SBA subsequently made concerning ACBP removal.

In any event, even if the plaintiffs had sought to recover for harm caused after the SBA's creation, and even if it is assumed for the sake of argument that the record is sufficient to show that some of the SBA's activities were unlawful and not entitled to First Amendment protection,[4] the Claiborne Hardware standard still could not be satisfied. There can be no doubt that at least some of the SBA's activities were constitutionally

_____

[4]. For example, the plaintiffs, apparently referring to the booklet at issue in In re School Asbestos Litigation, 842 F.2d 671 (3d Cir. 1988), contend that "[t]he SBA disseminated misleading information about the danger of asbestos in schools directly to class members in this litigation, designed to reduce or limit Pfizer's and the other defendants' liability exposure in these cases by encouraging class members either not to abate or to use cheaper abatement methods. . . ." Resp. Class-Plaintiffs' Br. at 13-14. If true, these allegations might satisfy the elements of fraudulent misrepresentation. See Restatement (Second) of Torts § 525; Borelli v. Barthel, 211 A.2d 11, 12-13 (Pa.Super. 1965).

protected. As we noted in an earlier opinion, the SBA and its representatives provided testimony at congressional hearings, sent informational packages to and met with members of Congress, participated in EPA rulemaking, attended EPA meetings, submitted position papers to and served on advisory committees appointed by the EPA, and participated in legislative and regulatory proceedings in approximately 20 states. In re School Asbestos Litig., 842 F.2d at 674-75. Thus, Pfizer cannot be held civilly liable for any wrongful conduct committed by the SBA or its members in the years after the SBA's formation unless it can be shown that Pfizer's actions taken in relation to the SBA were specifically intended to further such wrongful conduct.

Here, there is simply no evidence that Pfizer had such an intent. The plaintiffs rely on the fact that Pfizer made a contribution (allegedly amounting to at least $50,000) to the SBA, but this fact is plainly insufficient. That donation could have been specifically intended to further one or more of the SBA's many constitutionally protected activities, or it could have been given for the general purpose of helping the SBA. A rational jury could not find based on the record before us that this donation was specifically intended to advance activities not protected by the First Amendment.

Nor is it enough that Pfizer was allegedly an "associate member" of the SBA. A member of a trade group or other similar organization does not necessarily endorse everything done by that organization or its members.

Pfizer's only other conduct that is related to the SBA -- the fact that three or four of Pfizer's in-house attorneys attended some SBA meetings -- is no more probative. Attendance at a meeting of an organization does not necessarily signify approval of <u>any</u> of that organization's activities. And, even if the attendance at issue here could reasonably be interpreted as an expression of general approval of the SBA's goals, it unquestionably could not rationally be viewed as sufficient to show that Pfizer specifically intended to further any allegedly tortious and constitutionally unprotected activities committed by the SBA or its other members. See <u>Claiborne Hardware</u>, 458 U.S. at 924 ("Regular attendance and participation at the [meetings] . . . is an insufficient predicate on which to impose liability [because the] . . . findings do not suggest that any illegal conduct was authorized, ratified, or even discussed at any of the meetings."). Accordingly, the SBA-related evidence on which the district court in this case relied does not come close to satisfying the strict standard required by <u>Claiborne Hardware</u>.

B. Although Pfizer's brief relied heavily on <u>Claiborne Hardware</u> (<u>see</u> Pet.'s Br. at 10, 18-21),[5] the plaintiffs' brief made little effort to distinguish that case. The entire discussion of <u>Claiborne Hardware</u> in that brief is as follows:

> Pfizer places great reliance on [<u>Claiborne Hardware</u>] for the proposition that their SBA activities are deserving of First Amendment protection. This argument simply diverts attention from the simplicity of the issue at

---

[5]. <u>See also</u> Br. for Resp. W. R. Grace & Co. at 12-13; Br. for for Amicus American Society of Association Executives at 9-10.

> hand, i.e., whether sufficient record
> evidence permitted the District Court to find
> that a jury could reasonably infer that
> Pfizer took part in a conspiracy or concerted
> action on the record evidence presented.
> Actions taken by Pfizer for which it may
> claim First Amendment or Noerr-Pennington
> protection[6] are not necessarily proper merely
> because they inevitably included lobbying
> efforts. In any event, SBA's and Pfizer's
> self-interested and misleading communications
> are not comparable to the kind of behavior
> which Pfizer points to in Claiborne.

Resp. Class-Plaintiffs' Br. at 22-23.

Read generously, this passage may perhaps be interpreted to mean (a) that the holding in Claiborne Hardware should be limited to the compelling factual context in which that case arose and (b) that the decision of the district court, even if it was wrong in relying on the SBA evidence, may nevertheless be sustained on an alternative ground, i.e., that the non-SBA evidence in the record was sufficient to preclude summary judgment for Pfizer on the conspiracy and concerted action claims. Neither of these arguments is persuasive.

As for the first, we readily agree that the factual background of Claiborne Hardware was very different from this case and that the constitutionally protected conduct in Claiborne Hardware was of much greater societal importance. We see nothing in the Supreme Court's opinion, however, that lends support to the suggestion that the standard it enunciated was not meant to

---

[6]. See United Mine Workers v. Pennington, 381 U.S. 657 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961);

have general applicability.  As a lower court, we do not feel free to give Claiborne Hardware such a narrow interpretation; and in any event, for the reasons explained in the Claiborne Hardware opinion, we would not do so even if we could.

The second argument -- that the district court's decision may be sustained based on non-SBA-related evidence -- is factually unsound.  Attempting to persuade us to accept this argument, plaintiffs' brief stated, without any citations to the record, that "[t]he district court was aware of and considered a factual record that included hundreds of documents . . . showing meetings, conferences, letters and tacit and direct agreements to conspire to conceal information or not to warn among Pfizer and other defendants."  Resp. Class-Plaintiffs' Br. at 24.  Prompted by this statement, we directed the plaintiffs to submit a letter-brief listing and providing a citation for every action taken by Pfizer that the plaintiffs wished us to consider in determining whether Pfizer could be held liable for civil conspiracy.  The letter-brief subsequently submitted by the plaintiffs contended that a rational trier-of-fact could draw 11 relevant inferences from the summary judgment record and that these inferences were sufficient to defeat Pfizer's summary judgment motion.  These inferences were:

> 1. Pfizer began to sell its Kilnoise . . . in 1964, without warnings.
>
> 2. Pfizer learned by at least 1965 that Dr. Irving Selikoff, one of the world's foremost asbestos researchers, had found a relationship between asbestos inhalation and cancer.

3. Pfizer continued to sell its [Kilnoise] for seven more years without warnings.

4. SBA members sold their [asbestos containing] products without warnings, some for as long as fifty years, despite knowledge of the dangers of asbestos and their products.

5. The SBA members and Pfizer were aware that each was selling its [asbestos containing] products without warnings.

6. SBA members had tacitly or overtly agreed to continue to sell their [asbestos containing products] without warnings, and did so until government regulations were enacted requiring them to place warnings on their [asbestos containing products].

[7]. There had been written agreements, meetings, and other communications among asbestos defendants to conceal their knowledge of the dangers of asbestos from the public.

[8]. One purpose of the SBA was to continue the original concealment of its members.

[9]. Pfizer was in attendance at SBA meetings and provided substantial financial support to the SBA.

[10]. The SBA materials were also intended to lower litigation costs for SBA members and other defendants.

[11]. Pfizer removed [asbestos containing materials] from its own facilities during the SBA's dissemination of materials to the class advising the class not to abate [asbestos containing materials].

Having carefully reviewed the portions of the record that are said to support these inferences, we are convinced that the record cannot sustain a claim against Pfizer based on either

a civil conspiracy or a concert of action. Inferences eight through ten relate to the SBA and are thus covered by our discussion above. Inferences six and seven would be highly significant if there were any evidence that Pfizer had engaged in the activities in question, i.e., if there were evidence that Pfizer had "tacitly or overtly agreed" with the other defendants to continue selling its product without warnings or had been a party to "written agreements, meetings, and other communications among asbestos defendants to conceal their knowledge of the dangers of asbestos from the public." However, our examination of the portions of the record cited by the plaintiffs in support of these inferences revealed no such evidence. Inference eleven -- that Pfizer removed asbestos containing materials from its own facilities while the SBA was advising against such removal -- has no bearing on whether Pfizer engaged in a conspiracy or concerted action with the other defendants.

The remaining inferences -- numbers one through five -- suggest that Pfizer and the other defendants consciously engaged in parallel courses of conduct, but under the law of Pennsylvania -- the only jurisdiction whose law has been briefed and therefore the only jurisdiction whose law we feel it appropriate to consider[7] -- conscious parallelism is not sufficient to establish either a civil conspiracy or concerted action.

_____

[7]. The plantiffs' brief argued that the evidence in the record is sufficient to establish a civil conspiracy or concerted action under Pennsylvania law, but they stated in a footnote that they did not agree that Pennsylvania law was controlling. Resp. Class-Plaintiffs' Br. at 26 n.9. Rather, they suggested that the law of all of the jurisdictions in which members of the plaintiff

In Burnside v. Abbot Lab., 505 A.2d 973, 982 (Pa.Super. 1985), the Pennsylvania Superior Court held that conscious parallelism is insufficient under either of these theories.  In that case, the plaintiffs contended, based on conspiracy and concert of action theories, that all the pharmaceutical companies that had manufactured diethylstilbestrol ("DES") should be jointly and severally liable for injuries caused by the ingestion of DES.  The court reviewed the required elements of civil conspiracy and concerted action and explained why the plaintiffs' allegations of conscious parallelism failed to satisfy these requirements.

To prove civil conspiracy in Pennsylvania, the court stated, a plaintiff must show "that two or more persons combine[d] or enter[ed] an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means."  Id. at 980. The court noted that "[p]roof of malice is an essential part of a cause of action for conspiracy," id. at 980 (citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)) and that the "`mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy.'"  Id. at 980-81 (quoting Fife v. Great

(..continued)
class are located should be applied.  Id.  They did not, however, brief the law of any other jurisdiction, and indeed, they did not provide a citation for even one non-Pennsylvania case.  Under these circumstances, we deem the plaintiffs to have forfeited the right to rely on the law of any other jurisdictions for purposes of the mandamus proceeding.

Atlantic & Pacific Tea Co., 52 A.2d 24, 39 (Pa. 1947), cert.

denied, 332 U.S. 821 (1947)).

With this in mind, the court reviewed the plaintiffs'

averments, which were as follows:
> From 1947 through 1941 [sic] each of the
> [d]efendants, individually and in concert
> with each other, manufactured and marketed
> DES under various names but in an identical,
> generic formula . . . .  Although defendants
> knew or should have known of the potential
> carcinogenic effects of DES, and its
> experimental status as a preventative for
> miscarriage, [d]efendants manufactured and
> marketed it without testing for teratogenic
> and carcinogenic effects; without warning for
> such potential effects, and without notice of
> the Food and Drug Administration's approval
> for only experimental use in prevention of
> miscarriage.

Burnside, 505 A.2d at 981-82.  These allegations, the court held,

were not enough to prove a civil conspiracy.  The court

explained:
> [T]he plaintiffs in the instant case have
> failed to allege the manner in which a
> conspiratorial scheme was devised and carried
> out.  The complaint contains no averments of
> meetings, conferences, telephone calls, joint
> filings, cooperation, consolidation, or joint
> licensing.  The plaintiffs have alleged no
> more than a contemporaneous and negligent
> failure to act.

Id. at 982 (emphasis added).

Similarly, the court found that the plaintiffs'

allegations failed to satisfy the elements of a concerted action.

The court explained that Pennsylvania appears to follow Section

876 of the Restatement (Second) of Torts, which states:
> For harm resulting to a third person from the tortious
> conduct of another, one is subject to liability if he

(a)  does a tortious act in concert with the other or pursuant to a common design with him, or

(b)  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c)  gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The court then concluded that subsection (a) requires proof of an explicit or tacit agreement[8] and that the plaintiffs' averments were insufficient to establish such an agreement.  The court likewise concluded that those averments were insufficient to show the "substantial assistance" needed under subsections (b) and (c).  The court wrote:

> The plaintiffs in this case . . . rely upon averments that the defendant manufacturers failed to test DES adequately and failed to give adequate warning of the risks inherent in its use as a miscarriage deterrent.  Plaintiffs have not alleged either a tacit understanding or common design to market a defective product or that appellees rendered substantial assistance in causing injury to the plaintiffs.  They have charged the defendants merely with "parallel and imitative" conduct . . . .  To sustain a cause of action for concerted tortious conduct under these circumstances would be to expand the doctrine of Section 876 of the Restatement beyond its intended scope. . . .

---

[8].  See also Restatement (Second) of Torts § 876, comment a, clause (a).

505 A.2d at 984.[9]

Since Burnside is a decision of a state intermediate appellate court, we are not bound to follow it, but such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Telephone & Telegraph Co., 311 U.S. 223 (1940). See also Commissioner v. Estate of Bosch, 387 U.S. 456 (1967); Northern Insurance Co. v. Aardvark Associates, Inc., 942 F.2d 189, 193 (3d Cir. 1991); Commercial Union Ins. Co. v. Bituminous Casualty Co., 851 F.2d 98, 100 (3d Cir. 1988). Here, we have not been presented with (and have not found) "other persuasive data that the [Supreme Court of Pennsylvania] would decide otherwise." We therefore follow the Superior Court's decision in Burnside; and applying the principles set forth in Burnside to the facts of this case, we do not see how a rational jury could find the existence of a civil conspiracy or concerted action based solely on the alleged fact that Pfizer and the other defendants consciously engaged in parallel conduct.

C. In sum, then, the district court's decision was clearly wrong. Worse, it has implications that broadly threaten First Amendment rights. The district court's holding suggests that Pfizer -- based solely on its limited and (as far as the

---

[9]. See also, e.g., Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1012-16 (D.S.C. 1981) (applying South Carolina law); Zafft v. Eli Lilly & Co., 676 S.W.2d 241, 244-45 (Mo. 1984); Sindell v. Abbott Laboratories, 607 P.2d 924, 931-33 (Cal. 1980), cert. denied, 449 U.S. 912 (1980).

record reflects) innocent association with the SBA -- could be held liable, as the plaintiffs have urged, for all of the allegedly tortious acts committed by all of the defendants, whether before or after the SBA was formed.  The implications of such a holding are far-reaching.  Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.  See, e.g., Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 294-96 (1981); Buckley v. Valeo, 424 U.S. 1, 14-25 (1976); N.A.A.C.P. v. Alabama, 357 U.S. 449, 466 (1958).  But the district court's holding, if generally accepted, would make these activities unjustifiably risky and would undoubtedly have an unwarranted inhibiting effect upon them.  For these reasons, we are convinced that Pfizer has shown that its right to the issuance of the writ is "clear and indisputable."

IV.

We thus turn to the question whether Pfizer has any other adequate means to obtain relief.  We have held that it is appropriate to issue a writ of mandamus in order to vacate an interlocutory order restraining constitutionally protected expression during the pendency of a trial.  Rodgers v. United States Steel Corp., 536 F.2d 1001, 1006 (3d Cir. 1976).  Other courts of appeals have reached similar results.  See In re King World Productions, Inc., 898 F.2d 56, 59 (6th Cir. 1990); In re Perry, 859 F.2d 1043, 1046-47 (1st. Cir. 1988); In re Halkin, 598

F.2d 176, 197-99 (D.C. Cir. 1979); Chase v. Robson, 435 F.2d 1059, 1062 (7th Cir. 1970). Mandamus has been found to be proper in these cases because the duration of a trial is an "intolerably long" period during which to permit the continuing impairment of First Amendment rights. In re Halkin, 598 F.2d at 199, (citing Bridges v. California, 314 U.S. 252, 268-69 (1941)). Although a party might be able to obtain earlier review by standing in contempt, courts of appeals have held that this is an inadequate remedy because the threat of contempt "might well suffocate the `breathing space' necessary for the exercise of . . . First Amendment rights." In re Halkin, 598 F.2d at 199; see also Chase, 435 F.2d at 1062. Thus, mandamus has been recognized as a proper remedy in cases involving prior restraints.

The reasons that justify mandamus in prior restraint cases weigh in favor of its use in the present case. Pfizer contends that, during the remainder of the district court proceedings, it may wish to engage, by means of the SBA, in a "public dialogue on the important issue of the safety of in-place asbestos contaminating building products,"[10] and Pfizer would suffer irreparable harm if it were deprived of the opportunity to engage in such constitutionally protected activity. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality) ("The loss of First

---

[10]. See Pet.'s Br. at 25. At oral argument, Pfizer stated that it feared that any further contributions to or association with the SBA might be admissible at trial, under the district court's ruling, as evidence of conspiracy or concerted action. Pfizer also feared that its continued membership in various non-asbestos trade associations could render it potentially liable for anything these groups said or did.

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")  While the district court's ruling did not directly prohibit Pfizer from associating with the SBA during the remainder of the district court proceedings, there can be little question that in reality the district court ruling will powerfully inhibit Pfizer from doing so.  Under the court's reasoning, any further participation by Pfizer in SBA activities -- any contributions, any attendance at meetings, etc. -- would appear to constitute evidence of Pfizer's participation in an ongoing conspiracy or concert of action and thus be admissible at trial to prove such claims.  Therefore, if Pfizer exercised its First Amendment rights in relation to the SBA, it would risk being held jointly and severally liable for all of the damages awarded against its codefendants.  In practical terms, the threat of such liability might well have a more powerful impact on an entity like Pfizer than the threat of civil contempt sanctions.  Yet if Pfizer had been ordered, on pain of civil contempt, to refrain from associating with the SBA during the pendency of the trial, the propriety of mandamus relief under Rodgers v. United States Steel Corp., supra, would be clear.  See also United States v. Bertoli, 994 F.2d at 1015.  In prior cases, we have taken "a flexible approach to the propriety of reaching the merits of a non-final order on mandamus or prohibition in that the mere possibility of other methods of review does not absolutely bar consideration of the petition."  Id.  Here, the inhibiting effect of the district

court's decision seems to us to be sufficient to justify the use of mandamus.

Although we held in Communication Workers Of America, AFL-CIO v. American Tel. & Tel. Co., 932 F.2d 199 (3d Cir. 1991), that it is generally inappropriate to use mandamus as a vehicle for reviewing the denial of summary judgment, the present case is dramatically different.  In Communication Workers of America, we noted that by declining to issue a writ mandating the entry of summary judgment we did no more than require the petitioner to undergo a trial.  Id. at 210.  We believed that the expense of trial was not alone so consequential as to justify issuance of a writ because appellate review following final judgment was an adequate means to obtain relief.  Id.  As we have explained, however, the harm in the present case goes well beyond the mere expense and inconvenience of litigation.  Failure to issue a writ in this case would subject Pfizer to a continuing impairment of its First Amendment freedoms.  Accordingly, we hold that the two conditions that must be satisfied before a writ of mandamus can issue -- the petitioner's entitlement to relief must be clear and indisputable and the petitioner must have no other adequate remedy -- are satisfied here.

V.

We recognize that even if a case satisfies these two conditions, the issuance of a writ of mandamus is not always required.  As the Supreme Court noted in Kerr, 426 U.S. at 403, "it is important to remember that issuance of the writ is in

large part a matter of discretion with the court to which the petition is addressed."  In this case, we think that the issuance of the writ is appropriate, not only because Pfizer has satisfied the Kerr prerequisites, but also because of the special nature of this case.  The district court's ruling unquestionably involves "important" issues, see In re School Asbestos Litig., 977 F.2d at 773, and is squarely contrary to Supreme Court precedent.  Moreover, the extraordinary size and complexity of this class action -- factors that diminish the utility of appellate review following final judgment -- must be taken into account.  See id.  As we have observed, mandamus is a safety valve in the final-judgment rule, and some flexibility is required in its application.  Id. at 774.  Furthermore, we have some concern that requiring Pfizer to stand trial for civil conspiracy and concert of action predicated solely on its exercise of its First Amendment freedoms could generally chill the exercise of the freedom of association by those who wish to contribute to, attend the meetings of, and otherwise associate with trade groups and other organizations that engage in public advocacy and debate.  An amicus (which represents executives who manage thousands of business, professional, educational, technical, and trade associations, professional societies and other nonprofit organizations) has argued that the district court's decision may have such an effect.  See Br. for Amicus American Society of Association Executives at 1-2, 5.  While we do not want to overestimate the likely impact of a single, interlocutory

district court decision, we do not think that the amicus's concern is wholly unfounded.

In light of the circumstances that we have described, and because we find that Pfizer has a clear and indisputable right to relief that cannot be effectively vindicated by any other means, we hold that mandamus is a proper remedy in this case.

## VI.

For the reasons stated above, we grant Pfizer's petition for a writ of mandamus; we vacate the district court's order denying Pfizer's motion for partial summary judgment; and

we remand the case for further proceedings consistent with this opinion.

_____

**Please see the Dissent, filed by Judge Walter K. Stapleton,Jr. this date, which will be listed and printed in separate form.**